## ROBERTS & CO. v. TAFT et al.

### (Circuit Court of Appeals, Sixth Circuit. July 2, 1901.)

### No. 935.

1. MUNICIPAL CORPORATIONS—REFUNDING BONDS—CONSTRUCTION OF STATUTES.
   Rev. St. Ohio, §§ 2729a, 2729b, authorizing the sinking-fund commissioners in cities of the first class to issue bonds to refund the bonded debt, should be construed with section 2701, authorizing cities to issue such bonds, and section 2709, providing that bonds so issued should be sold to the highest and best bidder after 30 days' notice by advertisement, since all such sections are in pari materia; and it is immaterial that the sections were adopted at different times, and are found in different chapters.

2. SAME—BIDS—SALES.
   A contract by the trustees of the sinking fund of the city of Cincinnati for the sale to a banking company of an entire issue of refunding bonds, without having advertised for or received bids therefor, is unauthorized and void, under Rev. St. Ohio, § 2709, providing that such bonds shall be sold to the highest bidder after 30 days' notice by advertisement.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

This is a bill filed for the purpose of compelling the specific performance of an agreement made June 15, 1898, between the complainant, Roberts & Co., and the trustees of the sinking fund of the city of Cincinnati, for the refunding of certain bonds of that city, amounting to $15,610,000, at par value. The bonds which it was proposed to refund were to mature on different dates from 1902 and 1909, and bore interest at rates varying from 6 to 7½ per cent. Roberts & Co. is a New York banking corporation, and in the agreement is denominated "The Bankers." The agreement, after reciting approximately the issues of outstanding bonds, and the purpose of the trustees of the sinking fund to refund them by an issue of bonds to be called "Cincinnati Consolidated Sinking-Fund Bonds" of the character described in sections 2729a and 2729b of the Revised Statutes of Ohio, and reciting further that The Bankers proposed to purchase a sufficient number of said refunding bonds to refund said outstanding bonds upon the terms thereinafter stated, runs on as follows: "Now, therefore, this agreement witnesseth that the trustees agree to sell and deliver to The Bankers, and The Bankers agree to buy and accept from the trustees, so many of the refunding bonds hereinafter described as can be lawfully issued and shall be necessary to be sold to provide for the refunding of the several issues of bonds above described, subject to the following reservations and conditions." After providing, in paragraph 1, for the denominations; a rate of interest at 3½ per cent., payable semiannually; that the bonds should bear date of the 1st day of January or of July in the year when they should be delivered to The Bankers; and that they should be due in 50 and redeemable in 30 years from their date, the agreement proceeded as follows: "(2) For the refunding bonds thus to be purchased by The Bankers they shall make payment at the time of delivery, in the manner hereinafter provided, either in cash or in outstanding bonds of the issues to be refunded. If said payment be in cash, it shall be the par value of the bonds thus paid for, with accrued interest until the time of such payment. If such payment be in outstanding bonds, the same shall be accepted by the trustees at prices which would yield or represent

to the city of Cincinnati an annual return of three and one-half per centum (3½) per annum, upon the cost of said bonds to said city, said prices and said annual return to be figured in accordance with 'Price's Stock Values'; the number of days, months, and years in such computation to be the unexpired term between the date of the delivery of said outstanding bonds by The Bankers to the trustees, and the date of the maturity thereof. As it is probable that the larger part of the outstanding bonds delivered by The Bankers to the trustees will be delivered by them before maturity, and therefore at a premium over and above the par value of said bonds, such premium may, at the option of the trustees, be paid in cash or in refunding bonds, or partly in each. (3) The Bankers may only purchase refunding bonds for cash within ninety (90) days next before the maturity of each of the issues first above mentioned, and then only to the amount of outstanding bonds maturing within said ninety (90) days. Unless enough bonds of any issue to be refunded have been delivered to the trustees prior to ninety days before the maturity of such issue to satisfy the trustees that means of payment of the outstanding bonds will be provided by The Bankers in cash on or before maturity, the trustees shall be at liberty to take such proceeding to provide the required money as to them may seem necessary. All outstanding bonds above described as and when acquired by The Bankers shall be by them promptly tendered to the trustees. Upon such tender by The Bankers to the trustees of any outstanding bonds more than ninety (90) days before the maturity of the bonds so tendered, the trustees shall accept the bonds so tendered, and pay the par value thereof, and the premium, if any thereon, with refunding bonds and cash as above provided. If The Bankers shall fail to deliver said outstanding bonds under this contract to the trustees in amounts and at times as follows, viz.: Not less than five hundred thousand dollars ($500,000) on or before the first day of January, 1899; not less than one million dollars ($1,000,000) on or before the first day of July, 1899; not less than one million five hundred thousand dollars ($1,500,000) on or before the first day of January, 1900; not less than two million dollars ($2,000,000) on or before the first day of July, 1900; not less than two million five hundred thousand dollars ($2,500,000) on or before the first day of January, 1901; not less than three million dollars ($3,000,000) on or before the first day of July, 1901; and not less than three million five hundred thousand dollars ($3,500,000) on or before the first day of January, 1902,—then, and upon any such failure, and at any time while the same continues, and notwithstanding a prior failure of similar nature may have been waived, the trustees may, at their option, terminate this contract by giving thirty days' written notice to The Bankers of their election so to do; and such termination shall absolutely discharge and put an end to this agreement, and the rights and liabilities of all parties and their assigns thereunder, and shall release The Bankers and their assigns from all damages and claims for damages whatsoever upon or arising out of this contract or any part thereof." Subordinate stipulations follow, which, in the view taken of the case by the court, are unnecessary to be recited. The defense principally relied on for the city rests upon the ground that the agreement, being substantially one for the sale of the proposed new bonds of the city to The Bankers as purchasers, and having been made without advertising them for bids, and then disposing of them to the highest bidder, as required by section 2709 of the Revised Statutes of Ohio, was unauthorized, and is void. Section 2701, which contains the general grant of power to municipalities to borrow money and issue bonds for the purpose of extending time of payment of existing indebtedness, and section 2709 just mentioned, together with sections 2729a and 2729b, under the authority of which the trustees of the sinking fund professed to act, are as follows:

"Sec. 2701. The trustees or council of any municipal corporation for the purpose of extending the time of the payment of any indebtedness which, from its limits of taxation such corporation is unable to pay at maturity, shall have power to issue bonds of such corporation or borrow money so as to change, but not increase, the indebtedness, in such amounts and for such length of time and at such rate of interest as council may deem proper, not to exceed the rate of eight per centum per annum."

"Sec. 2709. In no case shall the bonds of the corporation be sold for less than their par value, nor shall such bonds, when so held for the benefit of such sinking fund or debt, be sold, except when necessary to meet the requirements of such fund or debt. All sales of bonds, other than to the sinking fund, by any municipal corporation, shall be to the highest and best bidder, after thirty days' notice, in at least two newspapers of general circulation in the county where such municipal corporation is situated, setting forth the nature, amount, rate of interest and length of time the bonds have to run, with time and place of sale. * * * Provided, further, that when it shall appear to the trustees or council of any municipal corporation to be for the best interests of such corporation to renew or refund any bonded indebtedness of such corporation which shall not have matured, and thereby reduce the rate of interest thereon, such trustees or council shall have authority to issue for that purpose new bonds, with semiannual interest coupons attached, and to exchange the same with the holder or holders of such outstanding bonds if such holder or holders shall consent to make such exchange and to such reduction of interest, but the rate per annum of interest on any such new bonds thus issued in exchange by any city of the first class, or by any city of the first or second grade of the second class, shall not exceed four and one-half (4½) per cent. * * * Such new bonds shall not in any case be so issued in an amount in excess of such outstanding bonded indebtedness so to be renewed or refunded and may be in such denominations and payable at such time or times, and at such place, as may be determined by such trustees or council."

"Sec. 2729a. Be it enacted by the general assembly of the state of Ohio, that the sinking fund commissioners in cities of the first grade of the first class, for the purpose of refunding the bonded debt, exclusive of street improvement bonds of the city for which such trustees act, at a lower rate of interest, and for the purpose of buying the fee-simple or real estate held by the city under perpetual leases, wherein is secured to the city the option to buy the fee-simple at a fixed price, and where the money to buy can be procured at a smaller rate of interest on the price than is represented by the stipulated rents, shall have power to make and issue the bonds of such city, with coupons or registered, due fifty years and redeemable thirty years from date, bearing interest at a rate not greater than five (5) per centum per annum, payable semi-annually, to an aggregate amount not exceeding twenty-six millions of dollars, to be known as the * * * consolidated sinking fund bonds (filling the blank with the name of the city issuing the bonds). The bonds shall be signed by the president of the trustees of the sinking fund, countersigned by the auditor of the city, and have the seal of the city issuing them affixed.

"Sec. 2729b. Such of the bonds, in this act provided for, as may be intended and used for refunding bonded debt, which is payable out of or chargeable upon a special fund or special source of revenue, or is secured in whole or in part by any pledge or lien, shall be so lettered and numbered as to show the debt to which it is applicable. The secretary of the trustees of the sinking fund shall keep separate accounts of the proceeds and application thereof of bonds used to refund such debts, and of the revenues and sinking fund applicable to each class of said bonds, unless and until otherwise provided by law. Purchasers of any bonds authorized by this act shall not be held responsible for the application of purchase money. The property, credit and revenues of the city issuing bonds shall stand pledged alike for all the bonds issued, without priority of right of any part of the bonds so issued by reason of priority of the date or sale of the same, or for any other reason."

Within a few weeks after the making of the foregoing agreement, one George Guckenberger filed a petition in the court of common pleas of Hamilton county in behalf of himself and the other taxpayers of the city and of the city itself against the trustees of the sinking fund and the city, praying that the defendants therein be restrained from executing or performing the aforesaid agreement; the principal ground of the petition being that it had been made without offering the refunding bonds to the highest bidder, and that the bonds were salable at a premium of not less than

4 per cent. The defendants appeared, and contested the petition. A decree having been passed in favor of the petitioner, the case was taken by appeal to the supreme court of the state of Ohio, where the decree was affirmed (City of Cincinnati v. Guckenberger, 60 Ohio St. 353, 54 N. E. 376); that court being of the opinion that the disposition of the new bonds was controlled by the requirement contained in section 2709 that they should be offered at public sale to the best bidder. That court also held that the agreement was one which would require an unlawful increase of the bonded debt of the city. When the present case was brought on for hearing, Judge Thompson, who presided at the circuit, expressed his concurrence in the opinion of the state supreme court, and dismissed the bill, and the complainant has taken this appeal.

Lawrence Maxwell, Jr., and A. C. Cassatt, for appellant.

J. R. Sayler, E. A. Ferguson, and W. T. Porter, for appellees sinking-fund trustees.

C. J. Hunt and Wade H. Ellis, Corp. Counsel, for appellees city and trustees of sinking fund.

Before LURTON and SEVERENS, Circuit Judges, and CLARK, District Judge.

SEVERENS, Circuit Judge, having made the preceding statement of the case, delivered the opinion of the court.

Counsel for the appellant, in their brief and argument, have, as we think, quite properly moved directly to the decisive question in the case, which is whether the construction given by the court below to the Ohio statutes giving or affecting the authority of the trustees of the sinking fund to dispose of the new bonds is the correct construction or not. And it cannot be said that the question is wholly free from difficulty, although, upon an attentive consideration of the subject, we have reached a conclusion upon which we are comparatively free from doubt. It is clear enough that the transaction was for a sale of the new bonds, rather than an exchange of them for the old ones, within the meaning of the statutes referred to. The parties thereto properly characterized it as a sale and purchase by the terms employed in their stipulations. Old bonds were to be taken as part of the purchase money. In that way it was expected that the general purpose of taking up the old bonds would be promoted at the same time with the selling of the new. Moreover, it was provided that some part of the purchase price might be paid in cash if paid within a prescribed period of time. If, however, the transaction were held to constitute a contract for a sale in part and for an exchange in part, it would not affect the conclusion, for the contract can only be enforced, if at all, as an entirety.

We turn now to see by what statutes the transaction is to be governed. In the statement preceding this opinion we have set forth a copy of section 2701, which enables the municipality to borrow money and issue bonds to provide for the payment of indebtedness which it cannot otherwise meet at maturity; and also a copy of section 2709. So much of this latter section as precedes the proviso originally constituted a section embodied in the provisions of the chapter of the Ohio statutes relating to the power of mu-

nicipal corporations to borrow money and issue bonds. The proviso was added April 26, 1898. It will be observed that this section, as it was originally enacted, was in general and very comprehensive terms, and it was evidently intended, as it seems to us, to control the sale of all municipal bonds. We do not think it very important that the provisions relating to the sinking fund are in another chapter. The sinking fund is a mere instrumentality in the management of the fiscal affairs of the city, and has its special fitness in aiding in the management of the city's bonded debt, and is only a part of the general scheme mapped out in chapters 2 and 3 of division 9 of the statutes. The conditions present a clear case for the application of the rule of construction of statutes which are in pari materia, the rule being that all acts in pari materia are to be taken together, as if they were one law. Patterson v. Winn, 11 Wheat. 380, 385, 6 L. Ed. 500; U. S. v. Babbit, 1 Black, 55, 17 L. Ed. 94; In re Distilled Spirits, 11 Wall. 356, 20 L. Ed. 167. The rule is equally applicable notwithstanding the provisions are found in different chapters or divisions of the laws, and though they are enacted at different periods of time. Suth. St. Const. 283. And again, in the same work, it is correctly said, in section 288:

"When enactments separately made are read in pari materia, they are, treated as having formed in the minds of the enacting body parts of a connected whole, though considered by such body at different dates, and under distinct and varied aspects of the common subject. Such a principle is in harmony with the actual practice of legislative bodies, and is essential to give unity to the laws, and connect them in a symmetrical system. Such statutes are taken together and construed as one system, and the object is to carry into effect the intention. It is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy."

When it was proposed to enact a law providing for the issue of new bonds to exchange for old, it was very appropriately attached as a proviso to the general provisions of section 2709, as that section then stood. This in no wise impaired the force of the original enactment, but created an exception permitting an exchange of bonds in the circumstances and conditions prescribed. But that power was granted to the legislative body of the municipality, and not to any subordinate body; for it is conceded that the words "trustees or council" refer distributively to the "trustees" of hamlets or towns, and to the "council" of cities and villages. It is worthy of notice, in passing, that the legislature in granting this power to exchange bonds did so by express mention of that method. It is evident that the trustees of the sinking fund supposed that they had authority to make this contract from sections 2729a and 2729b, which are also set forth in the statement preliminary to this opinion. These sections are part of an "act supplementary to chapter 3," which relates to the sinking fund. This supplementary act was passed in 1880. Only the two sections referred to have any apparent bearing upon the question of construction we are considering. Section 2729a grants to the trustees of the sinking fund power to "make and issue the bonds of the city" "for the purpose

of refunding the bonded debt," and also for the purpose of buying the fee simple of real estate held by the city under perpetual leases, if that could be done to the advantage of the city. There is no suggestion of making exchange of new bonds for old, and the statute seems to contemplate simply the refunding of that species of debt. In view of the general mandate contained in section 2709, we should expect that all subsequent legislation which was merely amendatory or supplementary to existing laws in regard to the issue and disposition of municipal bonds would be passed in contemplation of the general rule already established in regard to the disposition of the bonds when issued (admittedly a wise and prudent policy), unless the legislature should clearly indicate a different intent. No doubt this might be done by a necessary implication arising upon the words employed. Here there is no such implication. Beyond doubt the legislature intended a sale of the bonds which would be necessary to purchase the title to the real estate it had in view, and, if a different method were contemplated in "refunding the bonded debt," we should expect to find some reference thereto. It is true, this is not of itself at all conclusive, but it is one of many signs which all point to one result. Then, in section 2729b, we find distinct, if not necessary, implications that it was intended there should be a sale of the bonds. It is there provided that "the secretary of the trustees of the sinking fund shall keep separate accounts of the proceeds, and application thereof, of bonds used to refund such debts." And, again, "purchasers of any bonds authorized by this act shall not be held responsible for the application of purchase money." We think, therefore, there can be no reasonable doubt that the trustees were mistaken in supposing that they were empowered to make this contract by the above-quoted sections of the act of 1880, whether the contract was to be regarded as one for a sale (in which case it must have been advertised for competitive bidding), or for an exchange, which the council alone, and not the trustees, had power to make. If, upon attentive consideration, we had found the construction of these statutes more obscure than it now seems to us, we should have been inclined to give much weight to what is said to have been the interpretation put upon them by the learned gentlemen who have at various times had charge of the sinking fund. But it is only in such case that the court is permitted to yield its own judgment.

It is unnecessary to consider the other question, which is whether the execution of the agreement would unlawfully increase the bonded debt of the city. Nor have we any occasion to consider to what extent we are bound by the decision of the supreme court of Ohio, since we entirely agree with it upon the ground on which we rest our decision. The decree of the circuit court dismissing the bill will be affirmed.